**POTWINUNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ANTERIOR ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | : | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| BARBARA JOYCE POTVIN<br><br>*Plaintiff,*<br>vs.<br><br>ELI LILLY AND COMPANY<br>LILLY USA, LLC<br>*Defendants.* | : | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.:_______________ |

**DIRECT FILING ORDER AND VENUE**

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections, and privileges, and obligations of the Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Eastern District of Pennsylvania as Plaintiff's venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors:

__ Plaintiff currently resides in Naples, Florida.

__ Plaintiff purchased and used Defendant(s)' products in Florida.

__ The Original Venue is a judicial district in which Defendant Eli Lilly and Company et al. reside, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

_X_ The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically, (28 U.S.C. § 1391(b)(2)):

__ There is no district in which an action may otherwise be brought under 28 U.S.C. § 1391, and the Original Venue is a judicial district in which Defendant Eli Lilly and Company Inc. et. al. is subject to the Court's personal jurisdiction with respect to this action (28 U.S.C. § 1391(b)(3)).

__ Other reason (please explain): ____________________________________________.

## COMPLAINT AND JURY DEMAND

Plaintiff, Barbara Joyce Potvin, by and through the undersigned counsel, brings this complaint against Defendants Eli Lilly and Company and Lilly USA, LLC (hereinafter "Defendant" or "Eli Lilly"), for damages suffered by Barbara Joyce Potvin, who was severely injured as a result of using Defendant's GLP-1 Zepbound, a prescription medication designed, researched, tested, manufactured, marketed, supplied, promoted, advertised, packaged, labeled, sold and/or distributed by Defendant and is approved for weight loss. In support thereof, Plaintiff alleges as follows:

## PARTIES

1. At all relevant times hereto, Plaintiff Barbara Joyce Potvin was a resident and citizen of Florida in the county of Collier.

2. Plaintiff was prescribed and took Zepbound as directed by her physicians.

3. As a result of her use of Zepbound, Ms. Potvin developed non-arteritic anterior ischemic optic neuropathy (NAION) and suffers severe physical and emotional injuries and radical changes to her lifestyle given her severe loss of sight.

4. Defendant Eli Lilly and Company is and at all relevant times has been an Indiana corporation with a principal place of business at Lilly Corporate Center, 893 S. Delaware St., Indianapolis, Indiana.

5. Defendant Lilly USA, LLC is and at all relevant times has been an Indiana LLC with a principal place of business at Lilly Corporate Center, 893 S. Delaware St., Indianapolis, Indiana, with at least one member who is a citizen of Indiana.

6. Defendants Eli Lilly and Company and Lilly USA, LLC are referred to collectively herein as "the Eli Lilly Defendants" or "Eli Lilly" or "Lilly."

7. Each of the Eli Lilly Defendants was the agent and employee of the other Eli Lilly Defendants and, in doing the things alleged, was acting within the course and scope of such agency and employment and with the other Eli Lilly Defendants' actual and implied permission, consent, authorization and approval.

8. In collaboration amongst themselves, as part of their business, and at all relevant times, the Eli Lilly Defendants designed, researched, manufactured, tested, labeled, advertised, promoted, marketed, sold, and/or distributed GLP-1 RAs, including Zepbound.

9. Zepbound belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs"). The active ingredient in Zepbound is known as tirzepatide. Other drugs and active ingredients, including Ozempic (semaglutide) and Trulicity (dulaglutide) also fall within the GLP-1 RA class, based on similarities in their mechanisms of action, physiologic effects, and chemical structure.

10. Medications within the GLP-1RA class of drugs mimic the activities of physiologic GLP-1, a gut hormone that binds to receptors throughout the body and, notably, activates GLP-1 receptors in the pancreas to stimulate the release of insulin and suppress glucagon.[1]

11. GLP-1 RAs are designed to work similarly, to stimulate insulin production and reduce glucose production, but engineered to last longer than naturally-occurring GLP-1, which has a short life and is quickly metabolized by enzymes.

12. GLP-1 RAs are prescribed, for certain patient populations, to improve blood sugar (glucose) in adults with type 2 diabetes, reduce cardiac risk, and/or aid in chronic weight management.

13. Defendants have acknowledged that gastrointestinal events are well known side effects of the GLP-1RA class of drugs.[2] However, Defendants have downplayed the nature, duration, extent, and seriousness of gastrointestinal events and failed to warn about other adverse events caused by their GLP-1RAs, even serious and devastating effects, including non-arteritic anterior ischemic optic neuropathy (NAION), which can result in blindness and permanent vision loss, and/or blurry and/or darkened vision, which may lead to falls and other injuries. Defendants have failed to provide adequate warnings about the risks of, among other things, NAION, all other, and its sequelae.

14. The decision to target the American population for the sale of Defendants' GLP-1RAs was not accidental. Defendants understood the vast financial potential of marketing

---

[1] D. Hinnen, *Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes*, 30(3) DIABETES SPECTR. 202-10 (Aug. 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5556578/.

[2] *See, e.g.*, CT Jones, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell"*, Rolling Stone (July 25, 2023), available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis-weight-loss-side-effects-1234794601 (last visited on 9/26/23).

medications for weight loss in the United States, where obesity rates were on the rise despite the culture's obsession with losing weight and being thin.

15. Defendants set on a course to create and expand the market for weight-loss medication(s) by, among other things, advocating for obesity to be classified as a disease and thereby expanding the market for their drugs, spending hundreds of millions of dollars in an effort to change the medical consensus on how to treat obesity, implementing cutting-edge invasive, unprecedented and multifaceted marketing campaigns that were so effective they engrained these drugs in the pop culture zeitgeist, and spending untold millions in an effort to get weight-loss medications covered under public and private insurance. Defendants engaged in this conduct even before GLP-1 RAs were approved for weight loss, encouraging extensive off-label demand for, and use of, GLP-1 RAs.

16. By undertaking that effort, Defendants also were systematically and intentionally targeting users of other diabetes medications. Defendants' promise of weight loss wrongfully enticed users of other diabetes medications to switch to a GLP-1 RA, although they never would have done so if not for the off-label promotion of those drugs.

17. Defendants also sought to make the GLP-1 RAs more accessible by, among other things, marketing through telemedicine where the criteria for qualifying for the drugs, *e.g.*, Body Mass Index ("BMI"), are more easily manipulated.

18. Defendants' efforts to conceal (or minimize) the risks associated with taking their drugs were intended to create the impression that these were "miracle drugs" to help users lose weight. However, Defendants never disclosed that many people who take these drugs stop taking them because of the drastic side effects (thereby never achieving weight loss or any health benefit allegedly associated with the drug(s)); the drugs do not result in meaningful weight loss for up to

15% of people;[3] the average weight loss for someone taking the drugs is a modest 10.09% of the person's body weight;[4] and a person will need to stay on these drugs for the rest of their lives to maintain the weight loss.[5] What is worse, Defendants kept this information hidden while actively degrading trust in the prevailing view that lifestyle changes like proper nutrition and exercise were the keys to health and can accomplish long-lasting weight loss and management for most people.

19. The efforts to engrain GLP-1 RAs such as Ozempic, Wegovy, Mounjaro, Zepbound, and Trulicity in the public conscious, to manipulate the medical community's views on obesity treatment, and to make the drugs more accessible acted as a launching pad for the explosive growth of the GLP-1 RAs, both for people with diabetes, and for people seeking to lose weight, whether they were using the drug as prescribed or off-label. Plaintiff would not have taken GLP-1 RAs if Plaintiff had been provided a full and clear warning of the true risks of taking these drugs.

20. Defendants' efforts to expand and grow the markets for treatment of diabetes and weight loss, whether off-label or not, worked. The U.S. GLP-1 RA market is expected to exceed $100 Billion by 2030 with total U.S. users comprising about 9% of the population.[6] This growth is a tremendous boon to GLP-1 RA makers but comes at a significant cost. Financially, it is expected that their lobbying efforts will pay off, and GLP-1 RAs may get added to prescription drug coverage under Medicare Part D in the coming years. Some analysts project that this will add

---

[3] Erica Carbajal, *Up to 15% of patients on weight loss drugs may be 'non-responders'*, BECKER'S HOSPITAL REV. (Apr. 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/upto-15-of-patients-on-weight-loss-drugs-non-responders.html.

[4] Gao, et al., *Efficacy and safety of semaglutide on weight loss in obese or overweight patients without diabetes: A systematic review and meta-analysis of randomized controlled trials*, FRONTIERS IN PHARMACOLOGY 1 (2022).

[5] Wilding, et al., *Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, 24 DIABETES OBES METAB. 1553, 1562 ("[T]reatment withdrawal led to most of the weight loss being regained within 1 year, …, reinforcing the need for continued treatment to maintain weight loss ….").

[6] J.P. Morgan Research, *The increase in appetite for obesity drugs* (Nov. 29, 2023), available at https://www.jpmorgan.com/insights/global-research/current-events/obesity-drugs#sectionheader#0.

$13.6 to $26.8 Billion to Medicare Part D expenses even if only 10% of people with obesity use them, causing a significant shift in premiums and coverage in other areas.[7]

21. The outsized growth of the market for GLP-1 RAs also means that the patient base has expanded to include many patients who would be better served choosing alternate treatment paths. Defendants' marketing campaigns have altered the public understanding of weight loss treatment, creating the impression that GLP-1 RAs are not just one tool among many available to doctors, but are instead "miracle drugs." But, these patients, like Plaintiff, were lured into a false sense of hope that GLP-1 RAs would guarantee results and be efficacious and safe. Plaintiff and other users injected themselves with GLP-1 RAs believing that they were doing something to promote their health when, in fact, it had the opposite effect.

22. As a result of the foregoing, Plaintiff has suffered and was diagnosed with injuries that were directly and proximately caused by regular and prolonged use of Zepbound. Plaintiff's injuries include, but are not limited to, non-arteritic anterior ischemic optic neuropathy (NAION).

23. Upon information and belief, Defendant failed to warn physicians and the end users of Zepbound of the complications and devastating effects of which the companies knew or should have known, including NAION, which can result in blindness and permanent vision loss.

24. Upon information and belief, Defendant failed to warn the end users of Zepbound of the complications and devastating effects of which the company knew or should have known.

25. Upon information and belief, Defendant's marketing was deceptive and misleading about the true risks associated with Zepbound, risks which the companies knew or should have known.

[7] Vanderbilt University Medical Center, *Cost of covering antiobesity drugs could be billions to Medicare despite, a new analysis finds* (Mar. 15, 2023), available at https://www.vumc.org/health-policy/medicare-antiobesity-medications-nejm.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) as the matter in controversy exceeds the value of $75,000, exclusive of interest and costs and is between citizens of different states and/or a foreign state, as Plaintiff is a citizen of the State of Florida and each Defendant is neither incorporated nor has its principal place of business in the State of Florida.

27. This Court has personal jurisdiction over Defendant consistent with the United States Constitution and 42 Pa. Consol. Stat. Ann. §5322 (Pennsylvania's "long arm" statute), as Plaintiff's claims arise out of Defendant's transaction of business, their tortious acts within the Commonwealth of Pennsylvania, their doing a series of similar acts for the purpose of thereby realizing pecuniary benefit, and by virtue of Defendant's substantial, continuous, and systematic contacts with the Commonwealth of Pennsylvania.

28. This Court has supplemental jurisdiction over the remaining common law and state law claims pursuant to 28 U.S.C. § 1367.

29. Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this District. Defendants routinely market their products at issue in this District and conduct business in this District related to their products at issue in the Commonwealth of Pennsylvania.

## BACKGROUND

### I. The Development and Approval of Mounjaro

30. Following the success of Novo Nordisk's Ozempic, scientists and other pharmaceutical companies began exploring the possibilities of combining GLP-1s with other compounds.

31. In the early 2010s, a team of scientists at Indiana University created tirzepatide, Mounjaro's (and Zepbound's) active ingredient, by combining GLP-1 and GIP into single molecules. [8]

32. GIP stands for glucose-dependent insulinotropic polypeptide. It is a natural hormone that works alongside GLP-1 to help control blood sugar and promote weight loss by signaling the pancreas to release insulin, slow stomach emptying, and increase feelings of fullness.[9]

33. In pre-clinical trials, obese rats given tirzepatide were observed to decrease their food intake, decrease their body weight and improve their glucose tolerance. [10]

34. Rats given tirzepatide were more likely to develop thyroid C-cell tumors. The offspring of pregnant rats given tirzepatide had fetal abnormalities. [11]

35. From 2018 to 2021 Eli Lilly conducted clinical trials collectively known as SURPASS. [12]

36. From 2019 to 2023, Eli Lilly conducted five additional clinical trials collectively known as SURMOUNT to test the effectiveness, safety, and long-term benefits of tirzepatide for chronic weight management in adults with obesity. [13]

---

[8] https://newatlas.com/triple-agonist-peptide-diabetes-obesity/35180/#:~:text=In%202012%2C%20we%20covered%20work%20led%20by,held%20promise%20as%20a%20treatment%20for%20obesity (last visited on Dec. 15, 2025).

[9] https://phelpshealth.org/news/featured-stories/understanding-mounjaro-guide-type-2-diabetes-patients#:~:text=A%20delicate%20balance:%20Glucagon%20is,the%20pancreas%20to%20release%20insulin (last visited on Dec. 15, 2025)

[10] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2022/215866Orig1s000PharmR.pdf (last visited on Dec. 15, 2025)

[11] https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/215866s000lbl.pdf (last visited on Dec. 15, 2025)

[12] https://diabetes.org/newsroom/latest-data-from-SURPASS-trials-demonstrate-tirzepatide-provided-blood-sugar-reductions-weight-loss#:~:text=Blood%20Sugar%20Reductions-,Latest%20Data%20From%20SURPASS%20Trials%20Demonstrate%20Tirzepatide%20Provided%20Meaningful%20Blood,with%20a%20test%20called%20A1C (last visited on Dec. 15, 2025)

[13] https://www.lilly.com/en-CA/news/press-releases/2024.12.4-tirzepatide-surmount-5-h2h

37. The SURMOUNT-4 Trial "Was a study of tirzepatide with obesity or weight, The main purpose was to learn about how Tirzepatide maintained body weight loss. The study had two phases: a lead-in phase in which all participants took tirzepatide and a treatment phase in which participants either continued tirzepatide or switched to placebo. The study lasted about 2 years (25 visits).[14]

38. The final trial, SURMOUNT-5, compared tirzepatide to Wegovy.[15]

39. Eli Lilly was already testing the drug's effectiveness for chronic weight management before it had been approved for Type 2 diabetes. Eli Lilly submitted a new drug application (NDA 215866) for tirzepatide under their brand name Mounjaro on September 15, 2021. [16]

40. The FDA approved Mounjaro on May 13, 2022 for the regulation of type 2 diabetes.[17]

41. Eli Lilly continues to be the holder of the NDA and therefore is required to submit supplements to the NDA, complete post-marketing surveillance, submit adverse event reports, maintain correspondence with the FDA and update the label.

42. The FDA's approval was based on the first nine SURPASS and SURMOUNT trials.[18]

---

[14] https://clinicaltrials.gov/study/NCT04660643
[15] *Id.*
[16] https://www.govinfo.gov/content/pkg/FR-2024-02-29/html/2024-04157.htm (last visited on Dec. 15, 2025)
[17] https://www.fda.gov/drugs/drug-approvals-and-databases/drug-trials-snapshots-mounjaro#:~:text=MOUNJARO%20(tirzepatide),How%20is%20this%20drug%20used (last visited on Dec. 15, 2025)
[18] *Id.*

43. In a news release dated May 13th, 2022, Eli Lilly reported that "While not indicated for weight loss, Mounjaro led to significantly greater weight reductions versus comparators in a key secondary endpoint." [19]

44. In a news release dated October 6th, 2022, the president of Lilly Diabetes, Mike Mason, stated "[o]besity is a chronic disease that impacts the health of nearly 100 million Americans and is a significant driver of healthcare costs… we are dedicated to helping people living with obesity through our research and development of innovative treatments like tirzepatide, which produced significant weight reductions in patients taking tirzepatide for type 2 diabetes in SURPASS." [20]

45. Eli Lilly acknowledges that Mounjaro is not a weight loss medication but simultaneously advertised its weight loss capabilities before the active ingredient, tirzepatide, was approved for chronic weight management by the FDA. [21]

46. On October 6th, 2022, the FDA granted Fast Track designation for the investigation of tirzepatide for the treatment of obese adults or overweight adults with weight-related comorbidities. [22]

47. On November 17th, 2022, Eli Lilly and Co. initiated a rolling submission for their Zepbound NDA (NDA 217806). **[23]**

48. The FDA dated and received the NDA on May 8th, 2023. [24]

---

[19] https://investor.lilly.com/news-releases/news-release-details/fda-approves-lillys-mounjarotm-tirzepatide-injection-first-and (last visited on Dec. 15, 2025)
[20] https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited on Dec. 15, 2025)
[21] https://investor.lilly.com/news-releases/news-release-details/fda-approves-lillys-mounjarotm-tirzepatide-injection-first-and (last visited on Dec. 15, 2025)
[22] https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited on Dec. 15, 2025)
[23] *Id.*
[24] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/217806Orig1s000ltr.pdf (last visited on Dec. 15, 2025)

49. The FDA approved tirzepatide under Eli Lilly's brand name Zepbound on November 8th, 2023 for chronic weight management in adults with obesity or adults who are overweight with at least one weight-related condition. [25]

50. According to a November 19th, 2025 summary of risk management plan released by Eli Lilly, patients with a history of proliferative diabetic retinopathy, nonproliferative diabetic retinopathy, and diabetic maculopathy were excluded from the tirzepatide clinical trial development program. [26]

51. On their website, Defendant Eli Lilly does disclose important safety information and provides a link to their medication guide and prescribing information. However, Defendant Eli Lilly does not specify NAION or permanent vision loss as a risk when taking tirzepatide for either diabetes management or weight management. [27]

## II. Eli Lilly Aggressively Marketed and Promoted Mounjaro

52. Eli Lilly launched a digital campaign for Mounjaro in January of 2023. [28]

53. On February 12, 2023, the same day as the SuperBowl LVII, Defendant Eli Lilly aired a 75-second advertisement for Mounjaro on FOX titled "What If?". [29]

---

[25] FDA Approves New Medication for Chronic Weight Management | FDA (last visited on Dec. 15, 2025)

[26] file:///C:/Users/avillarreal/Downloads/tirzepatide_MounjaroRMPsummary_v1point0%20(1).pdf (last visited on Dec. 15, 2025)

[27] https://mounjaro.lilly.com/how-to-use-mounjaro?gclsrc=aw.ds&gad_source=1&gad_campaignid=23012920200&gbraid=0AAAAAoh_8M_T4v4msb1HY-OSnC7n5uqu4&gclid=EAIaIQobChMIvby4gdq4kQMVT0tHAR0fTAUgEAAYASAAEgLp4_D_BwE (last visited on Dec. 15, 2025)

[28] https://xtalks.com/eli-lilly-spends-big-on-first-mounjaro-tv-commercial-for-diabetes-3424/#:~:text=Mounjaro%20received%20US%20Food%20and,FDA's%20fast%20track%20approval%20pathway (last visited on Dec. 15, 2025)

[29] https://www.ispot.tv/ad/1VpJ/mounjaro-what-if#:~:text=More%20Mounjaro%20Commercials-,Mounjaro%20TV%20Spot%2C%20'I%20See%20You'%20Featuring%20Simone%20Biles,Mounjaro%20TV%20Spot%2C%20'Bridge (last visited on Dec. 15, 2025)

54. This advertisement kicked off a commercial campaign that included at least seven other commercials, two of which featured Olympic athlete Simone Biles. [30] [31]

55. In March of 2023, Eli Lilly spent $21.4 million on Mounjaro TV advertisements, placing it in the top five of pharmaceutical companies who spent the most on TV advertisements for that month. [32]

56. An advertisement aired as part of their "What If" series, indicated that "Mounjaro is not a weight loss drug" in small font at the bottom of the screen, but also clearly indicated that Mounjaro can help decrease how much food you eat. [33]

57. In May of 2025, Eli Lilly launched a marketing campaign titled "Duets for Type 2 Diabetes" featuring *Modern Family* actor Eric Stonestreet. [34]

58. As part of their paid partnership, a promotional video was released on May 2nd, 2025 featuring the actor and his mother who both have Type 2 diabetes and take Mounjaro. [35]

59. In this video, Eric Stonestreet referred to Mounjaro as a "teammate" that helped him manage his type 2 diabetes and related symptoms. [36]

60. Stonestreet also stated that they participated in the paid partnership because they wanted to inspire others to talk to their doctors about Mounjaro. [37]

---

[30] https://www.ispot.tv/ad/BkSt/mounjaro-i-see-you-featuring-simone-biles (last visited on Dec. 15, 2025)

[31] https://www.ispot.tv/ad/6mcG/mounjaro-olympics-working-hard-featuring-simone-biles (last visited on Dec. 15, 2025)

[32] https://www.fiercepharma.com/marketing/eli-lillys-new-tv-spot-diabetes-med-mounjaro-leaps-top-dtc-ad-spenders-list (last visited on Dec. 15, 2025)

[33] https://www.ispot.tv/ad/fWgz/mounjaro-what-if (last visited on Dec. 15, 2025)

[34] https://mounjaro.lilly.com/duets (last visited on Dec. 15, 2025)

[35] *Id.*

[36] *Id.*

[37] *Id.*

61. On April 11, 2023, the New York Times reported that some research has found that "Mounjaro may be even more powerful than either Ozempic or Wegovy." It also reported that "many people [are] using it off-label to lose weight." [38]

62. Although a representative from Eli Lilly denied promoting or encouraging "the off-label use of any of [their] medicines," Eli Lilly was clearly interested in using tirzepetide for chronic weight management. [39]

63. In March 18th of 2024, Oprah Winfrey hosted a television special titled "An Oprah Special: Shame, Blame, and the Weight Loss Revolution" where she was joined by representatives from Eli Lilly and Novo Nordisk who discussed their respective weight loss medications. [40]

64. This special featured Dr. W. Scott Butsch and Dr. Amanda Velazquez who are both paid consultants and have received research funding from Eli Lilly. The video also features Rhonda Pacheco, Group Vice President of Diabetes and Obesity for Eli Lilly. [41]

65. Subsequently, the FDA issued a warning letter to both Defendants for their misleading drug advertisements determining that the media was false or misleading. [42]

66. In the letter, the FDA claimed that both Defendants discussed the benefits of their medications while omitting or understating the risks associated with these medications and the warnings associated with each drug. [43]

[38] https://www.nytimes.com/2023/04/11/well/live/ozempic-mounjaro-weight-loss-diabetes.html (last visited on Dec. 15, 2025)
[39] *Id.*
[40] https://www.fiercepharma.com/marketing/oprah-shines-her-star-power-glp-1s-new-weight-loss-drugs-tv-special#:~:text=When%20Winfrey%20asked%20why%20coverage,ABC%20to%20support%20the%20broadcast (last visited on Dec. 15, 2025)
[41] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/eli-lilly-and-company-716485-09092025 (last visited on Dec. 15, 2025)
[42] *Id.*
[43] https://www.pharmexec.com/view/fda-warning-letters-novo-nordisk-eli-lilly-hims-regarding-misleading-advertising (last visited on Dec. 15, 2025)

67. In early 2024, Eli Lilly launched a campaign titled "Get Better" with a new focus on obesity. [44]

68. They aired two films showcasing their "point of view around obesity—emphasizing [their] commitment to patients by highlighting the seriousness of this disease and the appropriate use of anti-obesity medicines." [45]

69. The second film, titled "Big Night" was released in March of 2024 during the Oscars. [46]

70. They have also invested in a branding campaign titled "A Medicine Company" intended to strengthen Eli Lilly's brand as a company that values "health above all" and as a pharmaceutical company that can be trusted. [47]

71. Lina Polimeni, chief corporate brand officer at Eli Lilly stated "[p]eople understand Lily as a manufacturer of medicine, but don't always understand Lilly as a company or as a brand." Also, "[t]here's a big effort happening right now in building a brand that people love and trust — one that explains why we make medicine for people and tackle diseases that are so hard to treat."[48]

72. According to open payments data, Eli Lilly spent $7,745,971.25 on marketing/consulting/travel/food and beverage/etc. to physicians or medical institutions in 2024 alone. [49]

73. In 2023, they spent $6,136,076.18 on the same. [50]

---

[44] https://investor.lilly.com/news-releases/news-release-details/lillys-newest-phase-get-better-campaign-challenges (last visited on Dec. 15, 2025)
[45] *Id.*
[46] https://www.youtube.com/watch?v=lZ3Dt74R4ak, https://www.youtube.com/watch?v=zQWk-Q3tmkE (last visited on Dec. 15, 2025)
[47] https://www.adweek.com/brand-marketing/eli-lillys-big-task-become-a-loved-and-trusted-pharma-brand/ (last visited on Dec. 15, 2025)
[48] https://www.campaignlive.com/article/lilly-building-brand-people-trust/1893652 (last visited on Dec. 15, 2025)
[49] https://openpaymentsdata.cms.gov/company/100000000088 (last visited on Dec. 15, 2025)
[50] *Id.*

74. Eli Lilly has spent money on grants to various hospitals like the Tufts Medical Center to whom they gave $250 million dollars. [51]

75. By the end of 2022, Mounjaro had sales of $482.5 million. In 2023, its first full year on the market, Mounjaro brought in nearly $5.2 billion. [52]

76. On December 18th, 2023 Global Data reported that based on clinical data, sales for Mounjaro are forecasted at $27 billion by 2029. [53]

77. In 2024, Mounjaro was rated the ninth most sold drug, generating $11,540,100,000 dollars in sales. [54]

78. Eli Lilly spent approximately $8,593,800,000 dollars on marketing, selling, and administrative expenses in 2024. [55]

79. They spent $7,403,100,000 dollars on the same in 2023. [56]

80. By the second quarter of 2025, Mounjaro had surpassed Ozempic in sales at over $5 million. [57]

81. Mounjaro has experienced the highest monthly gross sales post-launch compared to some other GLP-1 RAs including Ozempic. As of September 13th, 2025, Mounjaro was producing around $3 billion a month for Eli Lilly. [58]

---

[51] *Id.*
[52] https://www.pewresearch.org/short-reads/2024/03/21/as-obesity-rates-rise-in-the-us-and-worldwide-new-weight-loss-drugs-surge-in-popularity/ (last visited on Dec. 15, 2025)
[53] https://www.globaldata.com/media/pharma/obesity-drug-mounjaro-to-surpass-ozempic-with-27-billion-sales-in-2029-forecasts-globaldata/ (last visited on Dec. 15, 2025)
[54] https://www.drugdiscoverytrends.com/2024s-blockbusters-top-50-pharmaceuticals-by-sales/ (last visited on Dec. 15, 2025)
[55] https://www.statista.com/statistics/517713/eli-lilly-marketing-expenses/?srsltid=AfmBOooh4INZhImNQmWYuAN77jRyz_imlJeTdp6nMNFxZxJlCzXDDPgH (last visited on Dec. 15, 2025)
[56] Id.
[57] https://www.drugdiscoverytrends.com/top-25-drugs-by-sales-2025-h1/ (last visited on Dec. 15, 2025)
[58] https://www.iqvia.com/locations/united-states/blogs/2025/09/obesity-deep-dive-the-unparalleled-launch-success-of-mounjaro-and-zepbound (last visited on Dec. 15, 2025)

82. A November 6, 2025 article published in the scientific journal *Nature* stated that tirzepatide was on track to be the top selling drug in the world in 2025. [59] [60]

83. Eli Lilly serves on the board and/or provides direct financial contributions to many public health advocacy groups, including the Obesity Action Coalition. [61]

84. Eli Lilly and Novo Nordisk are members of the Obesity Medicine Association's Corporate Council. [62]

85. They are platinum members of this council, meaning they contribute more than $100,000 annually to the coalition's general operating efforts. [63]

86. Eli Lilly has been a contributing supporter to the coalition since 2020, before any of its drugs were approved for weight loss. [64]

87. In sum, Defendant Eli Lilly promoted the safety, efficacy, and sale of Mounjaro in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets and has never disclosed NAION resulting in permanent vision loss as a risk of the medication.

88. On May 24th, 2024 the Wall Street Journal reported that Eli Lilly spent $5.3 billion to boost manufacturing capacity for Zepbound and Mounjaro to ease shortages of the drugs. They referred to this investment as the "largest manufacturing investment in company history." [65]

---

[59] https://www.nytimes.com/2025/11/21/health/eli-lilly-one-trillion-value-pharmaceuticals.html (last visited on Dec. 15, 2025)
[60] https://www.nature.com/articles/d41573-025-00183-y (last visited on Dec. 15, 2025)
[61] https://www.obesityaction.org/corporate-partners/ (last visited on Dec. 15, 2025)
[62] https://obesitymedicine.org/resources/vendor-directory/ (last visited on Dec. 15, 2025)
[63] https://www.obesityaction.org/corporate-partners/ (last visited on Dec. 15, 2025)
[64] *Id.*
[65] https://www.wsj.com/health/pharma/eli-lilly-boost-supply-mounjaro-zepbound-weight-loss-drugs-d7060ef2?gaa_at=eafs&gaa_n=AWEtsqdNL_RPuCMGNGxal7XO8X0aJVT9G4xcB5jz9Yr3L1CJIzAf7D_JXWXO&gaa_ts=693c66db&gaa_sig=dx015W7HoeMCEOSZjtohKvIc-

89. Eli Lilly has integrated with numerous other telehealth companies like Noom to provide their weight loss medications to consumers. [66]

**III. Marketing Works: Eli Lilly's Rampant Promotion Resulted in Thousands of Prescriptions and Billions in Sales.**

90. As a result of Defendant Eli Lilly's all-encompassing advertising and promotion efforts, Mounjaro and Zepbound are widely prescribed throughout the United States.

91. Millions of Americans have been prescribed Mounjaro since its 2022 FDA approval, though exact prescription rates or current user numbers are unavailable due to discontinuations and access barriers. [67]

92. By 2023, the rate of Mounjaro prescribing had increased by 0.4% from the previous year and by 2024 it increased by 0.8%. [68]

93. By 2023, semaglutide and Mounjaro made up 70% of all spending done by Americans on GLP-1 RAs. [69]

94. Following the approval of Zepbound, tirzepatide prescriptions increased from 1.1 million to 1.4 million monthly prescriptions by February 2024. [70]

95. During December 2024, overall prescribing rates of anti-obesity medication was highest for tirzepatide. [71]

---

GkaYbXZO4wA9R9OtaeXQvezsUnWJOM5LQeLSitjn0A6BiJOYhYPR61lLGJevQ%3D%3D (last visited on Dec. 15, 2025)

[66] https://www.noom.com/in-the-news/noom-to-streamline-access-to-zepbound-vials-with-noom-glp-1-companion-through-integration-with-lillydirect-pharmacy-provider/?srsltid=AfmBOopZtRpDqDtHAkAvdIhz2i5v-GhSGkaLJWMWQuDZCDL-Jy-VNnNh (last visited on Dec. 15, 2025)

[67] https://www.fellahealth.com/guide/how-many-people-are-on-tirzepatide#:~:text=11,to%20discontinuations%20and%20access%20barriers (last visited on Dec. 15, 2025)

[68] https://www.truveta.com/blog/research/glp1-prescription-trends-december-2024#:~:text=%2C%20or%20unknown).-,Overall%20prescribing%20trends,semaglutide%20(sold%20as%20Wegovy) (last visited on Dec. 15, 2025)

[69] https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2832114 (last visited on Dec. 15, 2025)

[70] https://pmc.ncbi.nlm.nih.gov/articles/PMC11780480/ (last visited on Dec. 15, 2025)

[71] https://www.medrxiv.org/content/10.1101/2025.03.06.25323524v1 (last visited on Dec. 15, 2025)

96. A 2024 study estimated that Mounjaro's use grew by more than 250% each month in its first year of release, despite only being available for seven out of 12 months that year. [72]

97. Just three years post-launch, Mounjaro reached an average of 9 patients per provider.[73]

98. Since 2022 the amount of providers prescribing Mounjaro and the ratio of prescribed patients to prescribers has been increasing steadily. [74]

## IV. Use of Mounjaro and Zepbound has been linked to the development of NAION

99. Defendant Eli Lilly knew or should have known of the risk of NAION with use of Zepbound.

100. Defendant conducted clinical trials and has access to case reports and medical literature that provide them with superior knowledge compared to the general public as to the potential risks of their medications.

101. Non-arteritic anterior ischemic optic neuropathy (NAION) is a medical condition involving damage to the optic nerve resulting in the loss of vision.

102. NAION is irreversible and permanent.

103. It falls within the category of an eye stroke.

104. NAION is untreatable and can lead to permanent blindness.

105. While the precise cause of NAION is unknown, the general belief amongst the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.

---

[72] https://www.singlecare.com/blog/news/mounjaro-statistics-2025/ (last visited on Dec. 15, 2025)
[73] https://www.iqvia.com/locations/united-states/blogs/2025/09/obesity-deep-dive-the-unparalleled-launch-success-of-mounjaro-and-zepbound (last visited on Dec. 15, 2025)
[74] *Id.*

106. "[T]ransient hypoperfusion of the short posterior ciliary arteries causes acute ischemia to the optic nerve head (ONH), resulting in axonal swelling. This swelling compromises the axoplasmic flow, which subsequently increases the axonal swelling, contributing to the compression of ONH microcirculation, exacerbating the ischemia."[75]

107. Anterior ischemic optic neuropathy (AION) involves the 1mm segment of the optic nerve head, also known as the optic disc, and results in visible disc swelling.[76]

108. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.[77]

109. The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.[78]

110. After glaucoma, NAION is the second most common cause of blindness due to optic nerve damage.

111. Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[79]

[75]Wu, Kevin Yang and Evoy, François NAION: Diagnosis and Management. American Academy of Ophthalmology. August 1, 2022. Accessed February 18, 2025. https://www.aao.org/eyenet/article/naion-diagnosis-and-management

[76] Non-Arteritic Anterior Ischemic Optic Neuropathy (NAION). American Academy of Ophthalmology, EyeWiki. https://eyewiki.org/Non-Arteritic_Anterior_Ischemic_Optic_Neuropathy_(NAION). Accessed February 18, 2025.

[77] *Id.*

[78] *Id.*

[79] *Ischemic Optic Neuropathy,* Cleveland Clinic, (last reviewed 6/30/2024), available at https://my.clevelandclinic.org/health/diseaes/ischemic-optic-neuropathy

112. Unfortunately, there is no effective treatment for NAION. Vision may worsen in the four weeks following the event. Some patients may see modest improvement in their vision, but complete recovery of vision is unusual.[80]

113. Some NAION patients lose complete vision with no recovery in affected eye(s).

114. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blinded in one eye and certainly both eyes results in bumps and falls and injuries related to the unseen impacts and accidents.

115. About 15% of patients who have NAION in one eye eventually develop it in their other eye.[81]

116. GLP-1 receptors have been detected in neuronal cells in the human eye.[82]

117. For example, clinical observations by astute neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on a different GLP-1 drug, Ozempic, led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

118. The study "Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide" authored by Hathaway *et al.* involved patients examined in the neuro-ophthalmology clinic between December 1, 2017 and November 30, 2023 and consisted of 17,298

---

[80] Wu, Kevin Yang and Evoy, François NAION: Diagnosis and Management. American Academy of Ophthalmology. August 1, 2022. Accessed February 18, 2025. https://www.aao.org/eyenet/article/naion-diagnosis-and-management

[81] *Id.*

[82] Hebsgaard JB, Pyke C, Yildirim E, Knudsen LB, Heegaard S, Kvist PH. Glucagon-like peptide-1 receptor expression in the human eye. *Diabetes Obes Metab*. 2018; **20**(9): 2304-2308. doi:10.1111/dom.13339

patients including 16,827 patients over the age of 12, 710 of which had type 2 diabetes (T2D) and 979 were overweight or obese.[83]

119. Of the 710 T2D patients, 194 patients were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications.[84]

120. Of the 979 overweight/obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications.[85]

121. Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; $P < .001$; concordance coefficient = 0.84).[86]

122. Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort vs 0.8% (95% CI, 0%-1.8%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86).[87]

---

[83] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296
[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] *Id.*

123. The primary outcome of the Hathaway *et al.* study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[88]

124. Acknowledging the pathogenesis or cause of NAION remains unknown, the authors did not determine the mechanism in which semaglutide causes NAION, however, it was hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.[89]

125. A metanalysis of all clinical trials of GLP-1 receptor drugs found a non-statistically increased risk of optic ischemic neuropathy.[90] Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading a lower estimated risk.[91] However, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is nearly a doubling of the risk.[92]

126. A recent case series published by Katz *et al.*, "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine

---

[88] *Id.*
[89] *Id.*
[90] Silverii GA, Pala L, Cresci B, Mannucci E. Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomised controlled trials. *Diabetes Obes Metab*. 2025; 27(2): 1005-1009. doi:10.1111/dom.16076
[91] *Id.*
[92] *Id.*

patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[93]

127. The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[94]

128. The morning after the patient's first injection of semaglutide, she experienced painful vision loss in her left eye and was diagnosed with bilateral optic nerve swelling, and the initial impression was optic neuritis with poor recovery. She discontinued the medication only to start it again approximately two months later after which she then experienced painful vision loss in her right eye. Imaging performed on the right eye was consistent with NAION.

129. The same article includes reports of three patients who developed NAION following tirzepatide use.[95]

130. The first case involved a man in his sixties reporting a painless shade in the superior field of his left eye after using tirzepatide injections for a year. He was diagnosed with NAION after thorough testing to rule out other conditions. [96]

131. The second case involved a man in his sixties who experienced painless vision loss in his left eye upon awakening. He had been taking tirzepatide for a year when his dose was increased to 10 mg of tirzepatide weekly. His vision loss occurred 4 months after this dosage increase and he was diagnosed with NAION. [97]

[93] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. *JAMA Ophthalmol*. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058
[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.*

132. The third case involved a woman in her fifties who experienced painless vision loss in her left eye upon awakening 5 months after she started tirzepatide. She was diagnosed with NAION.[98]

133. On August 11th, 2025 a cohort study was conducted and published in *JAMA*. This study aimed to determine if using semaglutide or tirzepatide was associated with an increased risk of NAION and other optic nerve or visual pathway disorders. [99]

134. The study was conducted with population of 159,398 patients with Type 2 diabetes, including 79,699 patients taking semaglutide or tirzepatide and a comparison group containing the same amount of patients taking other antidiabetic medications. [100]

135. When researchers followed up with patients in two years, 35 patients (0.04%) who were taking semaglutide or tirzepatide developed NAION compared to 19 patients (0.02%) who developed NAION in the comparison group. The study found that treatment with semaglutide or tirzepatide was associated with an increased risk of optic nerve disorders, including NAION. [101]

136. The medical community is continuing to study whether use of GLP-1 RA medications carry a heightened risk of NAION. As stated by the FDA, "[g]iven the severe and irreversible nature of NAION and the growing popularity of GLP-1 RA, we aim to evaluate the previously observed safety signal with respect to NAION using a principled approach to study design and analysis," the agency has commissioned a non-randomized cohort study analyzing

[98] *Id.*
[99] Wang, Lindsey, Volkow, MD, Nora D., Kaelber David C., MD, PhD, MPH, Xu, Rong PhD. Semaglutide or Tirzepatide and Optic Nerve and Visual Pathway Disorders in Type 2 Diabetes. *JAMA Ophthalmol*. Published online August 11, 2025. doi:10.1001/jamanetworkopen.2025.26327.
[100] *Id.*
[101] *Id.*

insurance claims data from the FDA Sentinel System's Real-World Evidence Data Enterprise (RWE-DE) Commercial Network (HealthVerity).[102]

137. The study is ongoing and includes patients exposed to GLP-1RA medications indicated for treatment of Type 2 Diabetes, including Mounjaro.[103]

## V. Defendant Continues to Fail to Disclose the Risk of NAION and its Sequala

138. According to the Drugs@FDA website, the label for Zepbound has been updated on at least twenty-one (21) different occasions since 2023, with the most recent update on February 25, 2026. Despite this fact, Eli Lilly's labels have not contained any warning or any information whatsoever on the increased propensity of Zepbound to cause NAION and permanent vision loss as suffered by Plaintiff. [104]

139. To date, the label is still devoid of any mention of NAION.

140. Furthermore, Defendant has failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Zepbound, monitoring of patients while on the medication, and advising patients to cease use of the medication if they develop symptoms consistent with NAION or after the fact as to not risk the potential for injury in the other eye.

141. Nothing was or is stopping Defendant from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the label.

---

[102] https://www.sentinelinitiative.org/sites/default/files/documents/Risk-of-NAION-Following-GLP-1-Receptor-Agonist-Use-in-Patients-with-Type-2-Diabetes-Mellitus_v3.0_vF.pdf (last visited on Dec. 15, 2025)

[103] *Id.*

[104] https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=217806 (last visited on Jun. 29, 2026).

142. Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Zepbound's label without any prior FDA approval.

143. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

144. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischaemic Neuropathy" reported in connection with use of GLP-1RAs. The earliest reported Optic Ischaemic Neuropathy event associated with any GLP-1RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[105]

## PARTY PLAINTIFF

145. Plaintiff Barbara Joyce Potvin is a resident of Florida and is currently 68 years old.

146. On or around February 25, 2025, she consulted with Sheryl De La Motta-Murray, M.D. to discuss options for treatment of her weight loss.

147. As a result of this appointment, Sheryl De La Motta-Murray, M.D. prescribed Ms. Potvin Zepbound.

148. On or around May 2026, Barbara Joyce Potvin experienced sudden vision loss.

---

[105] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

149. On May 19, 2026, Barbara Joyce Potvin presented to Advanced Retina Institute where she was diagnosed with non-arteritic ischemic optic neuropathy in her right eye by Carl Danzig, MD.

150. Barbara Joyce Potvin stopped taking Zepbound.

151. Her eyesight loss is permanent.

152. At all times material to the above, the Zepbound label failed to adequately warn Barbara Joyce Potvin and her medical providers of the true risks of taking Zepbound.

153. At all times material to the above, the marketing and advertising failed to adequately warn Barbara Joyce Potvin and her medical providers of the true risks of taking Zepbound.

154. Her life is forever changed because of her usage of Zepbound.

155. Barbara Joyce Potvin will never see clearly again as a result of her usage of Zepbound.

156. Defendant knew or should have known that use of tirzepatide could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

157. Defendant continues to downplay the risk of NAION and has not changed or provided any warnings to the public and medical community.

158. Defendant's Zepbound was at all times utilized and prescribed in a manner foreseeable to Defendant.

159. Plaintiff used Zepbound, and did not misuse, or alter Zepbound in an unforeseeable manner.

160. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff and her physicians the true and significant risks associated with this medication.

161. As a result of Defendant's actions, Plaintiff and her physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendant's conduct.

162. As a direct result of being prescribed and using Zepbound, Plaintiff has been permanently and severely injured, having suffered serious consequences.

163. As a direct and proximate result of her Zepbound use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

164. Plaintiff diligently investigated the potential cause of these injuries, but their relationship to Zepbound was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

165. Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Zepbound, Plaintiff and/or Plaintiff's physicians would not have used the medication and would have chosen a different option for the treatment of her weight loss.

166. Plaintiff's life is forever changed as a result of Defendant's actions and inactions.

## COUNT I
## STRICT LIABILITY – FAILURE TO WARN
## (Pursuant to Applicable Product Liability Law)

167. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

168. Zepbound is a product within the meaning of Pennsylvania products liability law.

169. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Zepbound and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

170. Defendant, as the holder of the NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance and pharmacovigilance.

171. Defendant, as a manufacturer, distributer, and marketer of pharmaceutical drugs, is held to the level of knowledge of an expert in the field, and further, Defendant knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Zepbound were inadequate.

172. Plaintiff did not have the same knowledge as Defendant and no adequate warning, other clinically relevant information, or data was communicated to Plaintiff or to Plaintiff's prescribing and treating physicians.

173. Defendant had a duty to provide adequate warnings and instructions for Zepbound to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their products.

174. Defendant had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding

the risks and dangers associated with Zepbound as it became or could have become available to Defendant.

175. Defendant marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Zepbound, to health care providers empowered to prescribe and dispense Zepbound to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendant misled and continues to mislead the medical community about the risk and benefit balance of Zepbound, which resulted in permanent injuries to Plaintiff.

176. Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Zepbound created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

177. Despite the fact that Defendant knew or should have known that Zepbound caused unreasonable and dangerous side effects, it continues to promote and market Zepbound without providing adequate clinically relevant information.

178. Defendant knew or should have known that consumers, Plaintiff, specifically, would foreseeably and needlessly suffer injury as a result of Defendant's failures.

179. The Zepbound supplied to Plaintiff by Defendant was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold. Defendant possessed knowledge and information confirming the defective and unreasonably dangerous nature of Zepbund but, despite this knowledge and information, Defendant failed and neglected to issue adequate warnings that Zepbound causes serious and potentially irreversible vision issues,

optic nerve damage, and NAION. Defendant has yet to issue any warnings or recommendations that patients taking Zepbound undergo ophthalmological monitoring.

180. Defendant's failure to provide adequate warnings or instructions rendered Zepbound unreasonably dangerous in that it failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendant, and in that the risk of danger outweighs the benefits.

181. Defendant continues to fail to provide adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

182. Defendant failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Zepbound including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

183. Defendant failed to provide adequate post-marketing warnings and instructions after Defendant knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

184. Defendant continued to aggressively promote and sell Zepbound, even after they knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drugs.

185. Defendant had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Zepbound, and/or that there existed safer and or equally effective alternative drug products that do not pose this same risk.

186. By failing to adequately test and research harms associated with Zepbound, and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed about the true risk-benefit profile of Zepbound and were not sufficiently aware that serious and potentially irreversible vision issues and optic nerve damage might be associated with use of Zepbound. Nor were the medical community, patients, patients' families, or regulators appropriately informed that serious and potentially irreversible vision issues and optic nerve damage might be a side effect of Zepbound and should or could be reported as an adverse event.

187. The tirzepatide products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant were defective due to inadequate post-marketing surveillance and/or warnings because, even after Defendant knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries from using Zepbound, Defendant failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote.

188. Zepbound is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendant had exercised all possible care in their preparation and sale.

189. The foreseeable risk of serious and potentially irreversible vision issues and harm to the optic nerve caused by Zepbound could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendant provided reasonable instructions or warnings of these foreseeable risks of harm.

190. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Zepbound, Plaintiff suffered bodily injuries and resulting pain and suffering, disability,

mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT II

## STRICT LIABILITY – DESIGN DEFECT
**Pursuant to Applicable Product Liability Law**

191. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

192. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Zepbound and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

193. Defendant, as the holder of NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance, and pharmacovigilance.

194. Defendant, as a manufacturer, designer, distributer, and marketer of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to the Plaintiff.

195. Zepbound is designed in such a way that posed an unreasonable risk of permanent vision loss and optic nerve injuries and was kept on the market despite being in a defective condition.

196. Defendant knew or should have known the Zepbound they developed, manufactured, labeled, marketed, sold, and/or promoted was defectively designed in that they posed a serious risk of severe and permanent vision and optic nerve injuries.

197. Defendant had a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

198. Defendant sold, marketed and distributed products that are unreasonably dangerous for their normal, intended, and foreseeable use.

199. Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Zepbound, a defective product which created an unreasonable risk to the health of consumers, and Defendant is therefore strictly liable for the injuries sustained by Plaintiff.

200. The Zepbound supplied to Plaintiff by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendant, posing a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

201. Plaintiff, ordinary consumers, and prescribers would not expect a diabetes drug designed, marketed, and labeled for weight loss and marketed for its supposed health benefits to cause irreversible vision issues and optic nerve damage.

202. The Zepbound supplied to Plaintiff by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendant, posing a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

203. The Zepbound taken by Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which it is sold.

204. Zepbound's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

205. The Zepbound taken by Plaintiff was in a condition not contemplated by the Plaintiff in that it was unreasonably dangerous, posing a serious risk of permanent vision loss and optic nerve damage.

206. Zepbound is a medication indicated for weight loss. Zepbound in fact causes serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION, in one or both eyes, harming Plaintiff and other consumers.

207. Plaintiff, ordinary consumers, and prescribers would not expect a diabetes drug designed, marketed, and labeled for weight loss and marketed for its supposed health benefits to cause irreversible vision issues and optic nerve damage.

208. The Zepbound supplied to Plaintiff by Defendant was defective in design or formulation in that its alleged benefits did not outweigh the risks of serious and potentially irreversible vision issues and optic nerve damage posed by the drug. In light of the utility of the

drug and the risk involved in its use, the design of Zepbound makes the product unreasonably dangerous.

209. Zepbound's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

210. The intended or actual utility of Zepbound is not of such benefit to justify the risk of optic nerve damage that may be irreversible and permanently disabling thereby rendering the product unreasonably dangerous.

211. The design defects render Zepbound more dangerous than other drugs and therapies designed to treat type 2 diabetes and obesity and cause an unreasonable increased risk of injury, including, but not limited, to potentially irreversible vision issues and optic nerve damage.

212. Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Zepbound created a risk of serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION in one or both eyes.

213. Zepbound is defective and unreasonably dangerous to Plaintiff and other consumers in that, despite knowledge that Zepbound use could result in vision issues, Defendant failed to adequately test or study the drugs, including but not limited to: pharmacokinetics and pharmacodynamics of the drugs, its effects on vision and the optic disc, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

214. Defendant acted unreasonably in its design of Zepbound in that Defendant failed to adopt a safer design for the product that was practical, feasible, and otherwise a reasonable alternative design or formulation that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

215. Defendant knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Zepbound's defective design.

216. Zepbound is defective and unreasonably dangerous to Plaintiff and other consumers even if Defendant had exercised all possible care in the preparation and sale of these products.

217. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Zepbound, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT III
## NEGLIGENT FAILURE TO WARN

218. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

219. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Zepbound and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

220. Defendant, as the holder of the NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

221. Zepbound was expected to reach, and did reach, users and/or consumers, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

222. Defendant owed Plaintiff and other Zepbound users a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling Zepbound.

223. At all times material, Zepbound was used in a manner intended and/or foreseeable to Defendant.

224. A reasonable patient or consumer of Zepbound would expect the drug to be free of significant defects.

225. Defendant knew or had reason to know of facts establishing that Zepbound could cause NAION and failed to warn of the risk.

226. At all times relevant hereto, the defective nature of Zepbound was known to Defendant, or reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold Zepbound, and not known to ordinary physicians who would be expected to prescribe the drug to their patients.

227. In disregard of its duty to timely warn consumers of health risks associated with Zepbound, Defendant committed one or more of the following negligent acts or omissions:

a. Failing to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians that Zepbound was designed and/or manufactured in a way that it could cause injuries and damages, including permanent vision loss;

b. Failing to timely disclose to Plaintiff and Plaintiff's prescribing and treating physicians the risk of NAION;

c. Failing to timely warn Plaintiff and Plaintiff's physicians that a base line eye exam should be performed and monioring was necessary.

228. At all relevant times, the label for Zepbound was inadequate because it did not warn and/or adequately warn of all possible adverse side effects of NAION and permanent vision loss.

229. At all relevant times, the label for Zepbound was inadequate because it did not warn and/or adequately warn that Zepbound had not been sufficiently and/or adequately tested for safety risks, including NAION.

230. The labels for Zepbound were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Zepbound.

231. Defendant's failure to warn of the above was the proximate cause of Plaintiff's injuries, harm, and economic loss, from which Plaintiff continues to suffer.

232. Defendant's failure to warn of the significant risks of Zepbound use prevented Plaintiff and Plaintiff's treating physicians from conducting a proper assessment of the risks and benefits of using Zepbound.

233. Had Plaintiff and/or Plaintiff's treating physicians been properly warned of the significant risks of Zepbound, Plaintiff would not have elected to begin and/or continue Zepbound.

234. Reasonable, safer alternative treatments were available to Plaintiff and/or Plaintiff's treating physicians had they been warned of these significant risks outlined herein.

235. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of

Zepbound, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT IV**
**NEGLIGENCE**

236. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

237. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Zepbound and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

238. Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

239. At all relevant times, Defendant had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of Zepbound products, including the duty to take all reasonable steps necessary to

manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

240. Defendant failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution and/or sale of Zepbound in that Defendant knew or should have known these drugs created a high risk of unreasonable harm to Plaintiff and other users.

241. Defendant had no reason to believe that intended and foreseeable users of Zepbound, such as Plaintiff, would realize the potential harm from use of these products.

242. Defendant failed to exercise reasonable care to inform users, such as Plaintiff, of Zepbound's risk of serious and potentially irreversible vision issues and harm to the optic nerve.

243. Defendant breached its duty of care to the Plaintiff and Plaintiff's physicians, in the testing, monitoring, and pharmacovigilance of Zepbound.

244. In disregard of its duty, Defendant committed one or more of the following negligent acts or omissions:

a. Manufacturing, producing, overpromoting, formulating, creating, developing, designing, selling, and distributing Zepbound without thorough and adequate pre- and post-market testing of the products;

b. Manufacturing, producing, overpromoting, advertising, formulating, creating, developing, and designing, and distributing Zepbound while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with the use of Zepbound;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Zepbound was safe for their intended use;

d. Failing to disclose and warn of the product defect to the medical community, and consumers that Defendant knew and had reason to know that Zepbound was indeed unreasonably unsafe and unfit for use by reason of the product defects and risk of harm to its users;

e. Failing to warn Plaintiff, the medical and healthcare community, and consumers that the Zepbound's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Zepbound;

g. Advertising, marketing, and recommending the use of Zepbound, while concealing and failing to disclose or warn of the dangers known by Defendant to be connected with, and inherent in, the use of this product;

h. Representing that Zepbound was safe for their intended use when in fact Defendant knew and should have known the product were not safe for their intended purpose;

i. Continuing to manufacture and sell Zepbound with the knowledge that Zepbound is unreasonably unsafe and dangerous;

j. Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Zepbound so as to avoid the risk of serious harm associated with the use of tirzepatide. Failing to design and manufacture Zepbound so as to ensure these drugs were at least as safe and effective as other similar products;

k. Failing to design and manufacture Zepbound was reasonably safe for their intended purpose in violation of objective safety standards;

l. Failing to ensure that Zepbound was accompanied by proper and accurate warnings about requiring baseline visual examinations and regular eye examinations while using the drug;

m. Failing to ensure that Zepbound was accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Zepbound and that use of tirzepatide created a high risk of severe, permanent injuries to vision; and

n. Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Zepbound.

245. A reasonable manufacturer, designer, distributor, promotor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

246. As a direct and proximate result of the Defendant's negligent testing, monitoring, and pharmacovigilance of Zepbound, Defendant introduced products they knew or should have known would cause injury to the optic nerve, NAION and resulting serious and permanent injuries to an individual's vision, and Plaintiff has been injured catastrophically and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

247. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Zepbound, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT V
## NEGLIGENT MISREPRESENTATION AND MARKETING

248. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

249. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Zepbound and placed this drug into the stream of commerce in a defective and

unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

250. Defendant, as the holder of NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

251. At all relevant times, Defendant negligently provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false or incorrect information or omitted or failed to disclose material information concerning Zepbound, including, but not limited to, misrepresentations regarding the safety and known risks of Zepbound.

252. The information distributed by the Defendant to the public, the medical community, Plaintiff and Plaintiffs' healthcare providers, including advertising campaigns, labeling materials, print advertisements, commercial media, was false and misleading and contained omissions and concealment of truth about the dangers of Zepbound.

253. Defendant's conduct had the capacity to deceive and/or purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Zepbound and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers to request, recommend, purchase, and prescribe Zepbound.

254. Defendant's intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Zepbound and induce the public and medical community, including Plaintiff and Plaintiff's healthcare provider to request, recommend, purchase, and prescribe Zepbound.

255. Defendant had a duty to accurately and truthfully represent and market to the medical and healthcare community, Plaintiff, Plaintiff's healthcare providers and the public, the known risks of Zepbound, including its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

256. Defendant made continued omissions in the Zepbound labeling, including promoting it as safe and effective while failing to warn of its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

257. Defendant made additional misrepresentations beyond the product labeling by representing Zepbound as a safe and effective treatment for weight loss with only minimal risks.

258. Defendant misrepresented and overstated the benefits of Zepbound to Plaintiff, Plaintiff's treaters, and the medical community without properly advising of the known risks to permanent vision loss.

259. In reliance upon the false and negligent misrepresentations and omissions made by the Defendant, Plaintiff and Plaintiff's healthcare providers were induced to, and did use Zepbound, thereby causing Plaintiff to endure severe and permanent injuries.

260. In reliance upon the false and negligent misrepresentations and omissions made by the Defendant, Plaintiff and Plaintiff's healthcare providers were unable to associate the injuries sustained by Plaintiff with Plaintiff's Zepbound use before it was too late. Defendant knew or should have known that the Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by the Defendant.

261. Plaintiff and Plaintiff's healthcare providers would not have used or prescribed Zepbound had the true facts not been concealed by the Defendant.

262. Defendant had sole access to many of the material facts concerning the defective nature of Zepbound and its propensity to cause serious and dangerous side effects.

263. At the time Plaintiff was prescribed and administered Zepbound, Plaintiff and Plaintiff's healthcare providers were unaware of Defendant's negligent misrepresentations and omissions.

264. The Defendant failed to exercise ordinary care in making representations concerning Zepbound while they were involved in their manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, because the Defendant negligently misrepresented Zepbound's risk of unreasonable and dangerous adverse side effects.

265. Plaintiff and Plaintiff's healthcare providers reasonably relied upon the misrepresentations and omissions made by the Defendant, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Zepbound.

266. Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

267. As a direct and proximate result of reliance upon Defendant's negligent misrepresentations, Plaintiff suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all

issues so triable as a matter of right.

**COUNT VI**
**BREACH OF EXPRESS WARRANTY**

268. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

269. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Zepbound and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

270. Defendant, as the holder of NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

271. Defendant expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendant and/or its authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that Zepbound was safe, effective, fit and proper for its intended use.

272. Zepbound materially failed to conform to those representations made by Defendant, in package inserts and otherwise, concerning the properties and effects of Zepbound, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendant constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Zepbound sold to Plaintiff.

273. Defendant expressly warranted that Zepbound was safe and well-tolerated. However,

Defendant did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Zepbound was particularly dangerous to the well-being of Plaintiff and Plaintiff's vision.

274. Zepbound does not conform to those express representations because they are defective, not safe, and have serious adverse side effects.

275. Plaintiff and Plaintiff's physicians justifiably relied on Defendant's representations regarding the safety of Zepbound, and Defendant's representations became part of the basis of the bargain.

276. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendant's representations that Zepbound was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

277. Plaintiff's healthcare providers justifiably relied on Defendant's representations through Defendant's marketing and sales representatives in deciding to prescribe Zepbound over other alternative treatments on the market, and Plaintiff justifiably relied on Defendant's representations in deciding to purchase and use the drug.

278. Plaintiff purchased and used Zepbound without knowing that drug is not safe and well-tolerated, but that Zepbound instead causes significant and irreparable vision loss and eye damage.

279. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Zepbound, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and

aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VII
## BREACH OF IMPLIED WARRANTY

280. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

281. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Zepbound, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

282. Defendant, as the holder of NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

283. Defendant was the seller of Zepbound, which was to be taken for weight loss.

284. When Zepbound was prescribed by Plaintiff's physician and taken by Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

285. Defendant impliedly warranted their product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and used, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

286. Defendant breached their implied warranties of the Zepbound product because the Zepbound sold to Plaintiff was not fit for its ordinary purpose to help with weight loss.

287. Zepbound would not pass without objection in the trade; they are not of fair average quality; they are not fit for their ordinary purposes for which the products are used; were not adequately contained, packaged and labeled; and fail to conform to the promises or affirmations of fact made on the container or label.

288. Defendant's breach of their implied warranties resulted in use of the unreasonably dangerous and a defective product by Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages alleged herein.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VIII
## VIOLATION PENNSYLVANIA UNFAIR TRADE PRACTICES / CONSUMER FRAUD ACT (73 P.S. SECT. 201-1) AND/OR PA CONSUMER PROTECTION ACT

289. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

290. Plaintiff purchased and used Zepbound primarily for personal use and therefore suffered ascertainable losses as a result of Defendant's actions in violation of Pennsylvania Unfair Trade Practices/Consumer Fraud Act, 73 P.S. Sect. 201-1, *et seq.*

291. Had Defendant not made affirmative misrepresentations, material omissions, and engaged in the deceptive conduct described herein, Plaintiff would not have purchased Zepbound and would not have incurred damages.

292. Defendant engaged in wrongful conduct while at the same time obtaining, under false pretenses, money from Plaintiff that would not have been paid had Defendant not engaged in unfair and deceptive conduct.

293. Despite knowing the falsity and misleading nature of their claims, Defendant engaged in unconscionable commercial practices, deception, fraud, false promise, misrepresentation and/or the knowing concealment, suppression or omission of material facts relative to the safety and efficacy of Zepbound.

294. Defendant intended such actions to mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Zepbound.

295. Such actions did, in fact, mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Zepbound.

296. Defendant had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of Zepbound.

297. Defendant's deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Barbara Joyce Potvin, constituted unfair and deceptive acts and trade practices in violation of Pennsylvania Unfair Trade Practices/Consumer Fraud Act, 73 P.S. Sect. 201-1, *et seq*.

298. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Zepbound, Barbara Joyce Potvin suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other

economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT IX**
**PUNITIVE DAMAGES**

299. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

300. The acts and omissions of Defendant described herein consisted of oppression, fraud, and/or malice, and were done with advance knowledge, conscious disregard of the safety of others, and/or ratification by Defendant's officers, directors, and/or managing agents.

301. Defendant's actions amounted to actual malice or reckless indifference to the likelihood of harm associated with their acts and omissions.

302. Defendant sold Zepbound to Plaintiff and other consumers throughout the United States despite their knowledge that Zepbound can cause the problems as set forth in this Complaint, thereby causing the severe and debilitating injuries suffered by Plaintiff.

303. Defendant misled both the medical community and the public, including Plaintiff and his physicians, by making false representations about the safety and effectiveness of Zepbound and by failing to provide adequate instructions concerning its use.

304. Defendant downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of Zepbound despite available information demonstrating that drug could cause NAION and irreversible vision loss.

305. Defendant was or should have been in possession of evidence demonstrating that Zepbound use could cause NAION and irreversible vision loss. Nevertheless, Defendant continues to market Zepbound by providing false and misleading information with regard to their safety and effectiveness.

306. Defendant failed to provide warnings that would have dissuaded health care professionals from using Zepbound, thus preventing health care professionals, including Plaintiff's prescribing physician, and consumers, including Plaintiff, from weighing the true risks against the benefits of using Zepbound.

307. As a proximate result of Defendant's acts and omissions, Plaintiff was diagnosed with NAION and suffers from irreparable vision loss due to Plaintiff's use of Zepbound.

308. As a result of Plaintiff's injuries, Plaintiff has endured substantial pain and suffering, has incurred significant expenses for medical care, and will remain economically challenged and emotionally harmed.

309. Plaintiff has suffered and will continue to suffer economic loss and has otherwise been emotionally and economically injured.

310. Defendant have engaged in conduct entitling Plaintiff to an award of punitive damages pursuant to Common Law principles.

311. Defendant's actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff and the public.

312. Plaintiff's injuries and damages are severe, permanent and will continue into the future. As a result, Plaintiff seeks actual and punitive damages from the Defendant.

313. Defendant's conduct was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to

punitive damages in an amount appropriate to punish the Defendant and deter them from similar conduct in the future.

314. Consequently, Defendant are liable for punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

315. Defendant is estopped from relying on the statute of limitations defense because Defendant actively concealed information concerning known risks, side effects, and defects in Zepbound. Instead of revealing such information to the FDA or the public, Defendant has continued to represent Zepbound as safe for its intended use.

316. Defendant is and was under a continuing duty to disclose the true character, quality and nature of risks and dangers associated with Zepbound. Because of Defendant's purposeful and fraudulent concealment of material information concerning the true character, quality and nature of risks of such products, Defendant is estopped from relying on any statute of limitations defense.

## DEMAND FOR JURY TRIAL

317. Plaintiff demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein, and prays for judgment in her favor and against Defendant awarding the following:

1. A monetary award, sufficient to compensate Plaintiff for the following categories of damages:

    a. actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

    b. actual and treble damages in such amount to be determined by this Court and as provided by law;

    c. exemplary and punitive damages sufficient to punish and deter Defendant and others from future wrongful practices;

    d. pre-judgment and post-judgment interest;

    e. costs including court costs, and other litigation expenses; and

    f. any other relief the Court may deem just and proper.

Dated: November 11, 2026

Respectfully Submitted,

*/s/ Jonathan Orent*
Jonathan Orent, Esq. (RI Bar # 7408)
Motley Rice LLC
40 Westminster St. 5th Fl.
Providence, RI 02903
Tel: (401)-457-7700
Fax: (401) 457-7708
jorent@motleyrice.com

*/s/ Grace Chandler*
Grace Chandler, Esq. (SC Bar #104097)
Motley Rice LLC
28 Bridgeside Blvd
Mount Pleasant, SC 29464
Tel: (843)-216-9000

Fax: (843) 216-9450
gchandler@motleyrice.com

/s/ Michael G. Daly

Michael G. Daly, Esq. (PA ID No. 309911)
Motley Rice LLC
Three Logan Square
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania 19103
Tel: (267)-267-4740
Fax: (856) 667-5133
mdaly@motleyrice.com

/s/ Joshua M. Neuman

Joshua M. Neuman, Esq. (PA ID No. 322648)
Motley Rice LLC
Three Logan Square
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania 19103
Tel: (267)-267-4740
Fax: (856) 667-5133
jneuman@motleyrice.com

*Attorneys for Plaintiff*